# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Apple Watch with Metal Band
Seizure Number 2024565300003902
("Target Device")

Case No. **23mj4636-MMP**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the Southern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8, USC sec. 1324(a)(1)(A)(ii) | Transportation of Certain Aliens |

The application is based on these facts:
See Attached Affidavit of CBP Enforcement Officer Ramon A. Galindo, U.S. Customs and Border Protection, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John J. Wemhoener, U.S. Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means).*

Date: 12/27/2023

*Judge's signature*

City and state: San Diego, California

Hon. Michelle M. Pettit, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, John J. Wemhoener, a United States Border Patrol Agent ("BPA") with the United States Border Patrol ("USBP"), Customs and Border Protection, Department of Homeland Security, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Apple Watch with Metal Band
> Seizure Number 2024565300003902
> ("**Target Device**")

as further described in Attachment A, and to seize evidence of crimes, specifically, violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of Certain Aliens), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Jose Guadalupe ESCAMILLA-Gomez for transportation of certain aliens. The **Target Device** is currently in the custody of the Department of Homeland Security, United States Border Patrol, Asset Forfeiture Office located at 311 Athey Street in Chula Vista, California 92173 (Evidence Vault).

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

//
//
//
//

## TRAINING AND EXPERIENCE

4. I am a BPA with the USBP within the Department of Homeland Security ("DHS"). I have been employed as a BPA since March 26, 2007. I am presently assigned to the Targeted Enforcement Unit ("TEU") at the Brown Field Border Patrol Station. I am a graduate of the United States Border Patrol Academy at the Federal Law Enforcement Training Center ("FLETC") in Artesia, New Mexico. I have received basic and advanced training in investigating alien smuggling, identifying immigration violations, and enforcing numerous immigration and customs laws within the United States.

5. As a BPA, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As an agent with the Border Patrol, my responsibilities include the investigation of possible violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324, and related offenses.

6. My past duties with the USBP include patrolling the United States/Mexico border to prevent the entry of aliens or contraband, and to arrest those who are in violation of immigration law or any other applicable federal or state law. During my time on patrol duties, I was involved in preparing and submitting cases, reports and evidence for administrative and criminal proceedings regarding immigration law and state violations.

7. From September 24, 2023, to the present day, I have been assigned to a plain clothes enforcement unit. The duties of this unit include developing criminal cases against alien smugglers and other members who held different roles within criminal smuggling organizations. I have conducted surveillance on static and mobile targets in plain clothes and while operating unmarked vehicles. I have worked on open

investigations, developing target files, writing administrative subpoenas, and developing leads on suspects.

8. Through the course of my career, I have arrested and interviewed numerous alien smugglers. Through these experiences, I have become familiar with the activities of those who coordinate smuggling events and the practices used for the drivers/smugglers they employ locally and abroad, including transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in investigating alien smuggling and the forensic examination of cellular phones and smartwatches, which may function similarly to a cellular phone, and may operate independently from or in conjunction with a cellular phone. The opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones and/or smartwatches that function similar to or in conjunction with cellular telephones, to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones and smartwatches permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the

3

status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

11. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone and/or smartwatch-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

12. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones and smartwatches that function similar to or in conjunction with cellular telephones (including their Subscriber Identity Module ("SIM") card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations,

4

I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones or smartwatches that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

13. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone and/or smartwatch. Specifically, searches of smartwatches may yield evidence:

   a. tending to indicate efforts to transport, move, or attempt to transport or move aliens without lawful status within the United States by means of transportation or otherwise;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of aliens without lawful status within the United States;

   c. tending to identify co-conspirators, criminal associates, or others involved in the transportation of aliens without lawful status within the United States;

   d. tending to identify travel to or presence at locations involved in the transportation of aliens without lawful status within the United States, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

   f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

# FACTS SUPPORTING PROBABLE CAUSE

14. On November 14, 2023, Border Patrol Agents Mauro A. Hernandez-Andrade and Matthew J. Oleson were performing line-watch duties near Dulzura, California in the Brown Field Border Patrol Station's area of operations. They were in full United States Border Patrol rough-duty uniform with badge and patches visible, and were riding in one marked Border Patrol vehicle with emergency lights and siren.

15. Agents Oleson and Hernandez were advised over agency radio that a light-colored vehicle with front fog lights was observed on a digital intrusion device picking up some individuals on Marron Valley Road. Marron Valley Road is a north/south dirt road where the northernmost part connects to State Route 94 ("SR-94"), and where the southernmost part ends approximately half a mile north of the United States International Boundary. Agents Oleson and Hernandez observed a vehicle matching the description that was given. Agents Oleson and Hernandez followed a light-colored Jeep bearing California license plates. At approximately 6:26 PM, Agents Oleson and Hernandez conducted a vehicle stop. The vehicle initially yielded and then sped off as soon as Agents Oleson and Hernandez were exiting their vehicle. Agents were alerted via service radio of the failure to yield. Agent Oleson and Hernandez gave chase of the vehicle and observed the vehicle drop off three individuals and speed away again. Agent Oleson followed the vehicle, but was advised to terminate the pursuit. Agent Hernandez chased and ordered the three individuals to stop running and conducted an immigration inspection. All three individuals, later identified as Moises Pabell Zazueta-Higuera, Alma Veronica Gutierrez-Ruiz, and Aremi Lizbeth Perez-Ramirez, stated that they are citizens and nationals of Mexico without any documents allowing them to be in the United States legally. At approximately 6:48 PM, Agent Hernandez placed all three individuals under arrest. The arrest location is located approximately 12 miles north of the United States/Mexico International Boundary and approximately two and a half miles east of the Otay Mesa, California Port of Entry.

16. On November 14, 2023, I was conducting Targeted Enforcement Unit

6

("TEU') operations near Chula Vista, California, which is in the Brown Field Border Patrol Station's area of responsibility ("AOR"). I was in plain clothes wearing a service issued ballistic vest with a Border Patrol badge embroidered on the left breast. I was driving an unmarked Border Patrol vehicle equipped with emergency lights and siren. At approximately 6:36 PM, I was informed that the vehicle Agent Oleson had been pursuing was a tan or silver Jeep SUV bearing California license plate number 6CRY435. I was given an address associated with the vehicle and drove around the area to conduct surveillance.

17.  At approximately 7:15 PM, I encountered the target vehicle near the intersection of Wightman Street and Villa Terrace. I observed an individual later identified as defendant Jose Guadalupe ESCAMILLA-Gomez get out of the vehicle. I approached ESCAMILLA and identified myself as a United States Border Patrol Agent. I asked ESCAMILLA if the vehicle belonged to him and if he had been driving the vehicle. ESCAMILLA stated yes to both. At approximately 7:22 PM, I advised ESCAMILLA that he was under arrest for alien smuggling, in violation of 8 U.S.C. Section 1324. The **Target Device** was on ESCAMILLA's person at the time of arrest.

18.  Defendant Jose Guadalupe ESCAMILLA-Gomez was read his *Miranda* rights and agreed to speak without the presence of an attorney. ESCAMILLA stated that on November 14, 2023, he received a call from a Mexican phone number. ESCAMILLA added that the person who called him told him that he had to do what he said, or he would kill his parents in Tijuana, Mexico. ESCAMILLA stated that he agreed to follow the person's directions, because he felt that the threat was credible after the person showed him a picture of his parents' home in Tijuana. ESCAMILLA stated that after he agreed to the condition of the person, he was given directions and coordinates of where to go. ESCAMILLA stated that he ended up driving on State Route 94 and from there he took a dirt route south for about 10 minutes until he was told to stop. ESCAMILLA stated that once he arrived at the coordinates he was given, he was then told to open the rear door of his Jeep Cherokee and to not look back at the people that

7

would enter the vehicle.

19. ESCAMILLA stated that he knew what he was doing was illegal, but he continued with it because of the threat to his parents. ESCAMILLA stated that he picked up a man and two women. ESCAMILLA added that the man he picked up began telling him what to do and where to go and the male jumped into the front passenger seat and told him to head back out towards the paved road. ESCAMILLA stated that once he arrived on State Route 94 the male subject told him to head west. ESCAMILLA added that the male subject would tell him to speed up. ESCAMILLA stated that the male subject would tell him, "Do not look back or you know what will happen," referring to his parents. ESCAMILLA stated that he was driving at a high rate of speed when he was pulled over by Border Patrol near Jamul Casino.

20. ESCAMILLA stated that he had intended to stop but was threatened by the male passenger. ESCAMILLA stated that he was told to drop off the passengers and then continue to flee from agents. ESCAMILLA stated that he did as he was told and dropped off his three passengers and fled from Border Patrol. ESCAMILLA stated that after he outran Border Patrol, he went directly to his work site. ESCAMILLA stated that he was contacted by the person with the Mexican phone number and told to delete all their corresponding text messages and calls. ESCAMILLA stated that he did exactly what he was instructed to do and was later arrested by Border Patrol.

21. Moises Pabell Zazueta-Higuera was read his *Miranda* rights and agreed to speak without the presence of an attorney. Zazueta stated that he is a citizen of Mexico without any immigration documents allowing him to enter or remain in the United States legally. Zazueta stated that he made smuggling arrangements and agreed to pay $9,500 USD. Zazueta stated that he crossed the International Boundary line on November 13, with three other individuals. Zazueta stated that one of those three individuals was the foot guide. Zazueta stated that the foot guide did not cross, but instead instructed them on what path to take. Zazueta stated that the foot guide told them that once they were at the pickup location a brown Jeep would arrive to pick them up.

8

Zazueta stated that when the brown Jeep arrived, the driver of the Jeep asked them if they were headed to Los Angeles. Zazueta stated that once he told the driver that they were headed to Los Angeles they got in the car. Zazueta stated that the driver later told him to sit in the front passenger seat. Zazueta stated that the driver of the Jeep sped off after he noticed the police lights, and Zazueta stated that he feared for his life. Zazueta stated he and the other two individuals got out of the Jeep and the driver sped off.

22. Alma Veronica Gutierrez-Ruiz and Lizbeth Perez Ramirez, stated that they are citizens of Mexico without any documents allowing them to enter or remain in the United States legally. Gutierrez and Perez stated that smuggling arrangements were made prior to crossing and they were paying a smuggling fee between $5,000 to $12,000 USD if successfully smuggled into the United States. Gutierrez and Perez stated that they crossed near Tijuana. They both stated that the foot guide instructed them to enter the smuggling vehicle. Gutierrez and Perez stated that once in the vehicle the driver drove recklessly and eventually instructed them to get out of the vehicle. Gutierrez was shown two photographic line-ups and was only able to identify ESCAMILLA as the driver for this event. Perez was shown two photographic line ups and identified Moises Pabell Zazueta-Higuera as the foot guide and ESCAMILLA as the driver for this event.

## METHODOLOGY

23. It is not possible to determine, merely by knowing the smartwatch's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Smartwatches today, either independently or in conjunction with cellular telephones, can function as simple cellular telephones and text message devices, serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services and web services. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode"

which disables access to the network. Unlike typical computers, many smartwatches do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I or a case agent familiar with the investigation will collect the subject target device and subject it to analysis. All forensic analysis of the data contained within the smartwatch and the memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

26. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//

10

## CONCLUSION

27. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of the Defendant's violations of Title 18, United States Code, Section 1324. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
John J. Wemhoener-Cuite
Border Patrol Agent
U.S. Border Patrol

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 27th day of December, 2023.

_____
Hon. Michelle M. Pettit
United States Magistrate Judge

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> Apple Watch with Metal Band
> Seizure Number 2024565300003902
> ("**Target Device**")

The **Target Device** is currently in the possession of the Department of Homeland Security, United States Border Patrol, Asset Forfeiture Office located at 311 Athey Street in Chula Vista, California 92173 (Evidence Vault).

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the smartwatch described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the smartwatch for evidence described below. The seizure and search of the smartwatch shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the smartwatch will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of October 14, 2023 to November 14, 2023:

a. tending to indicate efforts to transport, move, or attempt to transport or move aliens without lawful status within the United States by means of transportation or otherwise;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the transport of aliens without lawful status within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the transport of aliens without lawful status within the United States;

d. tending to identify travel to or presence at locations involved in the transport of aliens without lawful status within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device** and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii).